IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF
ONE BLACK LG CELL PHONE, ONE RED
APPLE IPHONE, ONE BLACK FLIP
PHONE, AND ONE BLACK APPLE I-
PHONE SEIZED BY VIRGINIA STATE
POLICE SUBSEQUENT TO STATE
SEARCH WARRANT ON DECEMBER 19,
2022 AND CURRENTLY LOCATED AT
VIRGINIA STATE POLICE HIGH TECH
CRIMES DIVISION 7700 MIDLOTHIAN
TURNPIKE NORTH CHESTERFIELD,
VIRGINIA 23225

Case No.  3:23sw20

**Filed Under Seal**



## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Davis B. Gooding, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an Application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—

ONE BLACK LG CELL PHONE, ONE RED APPLE IPHONE, ONE BLACK FLIP PHONE,

AND ONE BLACK APPLE I-PHONE (the Target Devices), more fully described in Attachment

A—which are currently located at Virginia State Police High Tech Crimes, 7077 Midlothian

Turnpike, North Chesterfield, VA 23225,  in the Eastern District of Virginia. Based on the

information set forth below, there is probable cause to believe that evidence of drug trafficking,

drug possession, conspiracy to commit drug trafficking, and illegal firearm possession—more

fully described in Attachment B, incorporated by reference herein—will be found in the Target

Devices.

2.      I am a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed since July 2021. As a TFO, I am authorized to investigate violations of the laws of the United States and am currently engaged in numerous criminal investigations involving violations of federal law.   I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. *See* 18 U.S.C. § 3051. I am also a duly sworn Special Agent of the Virginia State Police (VSP) Bureau of Criminal Investigation, Drug Enforcement Section, Richmond Field Office, and have been so employed since March 2015.  I completed the Virginia State Police Basic Law Enforcement Training and more than one year of on-the-job training with the ATF Violent Crime Reduction Task Force in Richmond, Virginia, which included instruction on investigating federal crimes involving firearms, narcotics, arson, and explosives. Since 2012, I have received further training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, and narcotics and various other crimes.  I am currently assigned to the ATF Washington Field Division, Richmond Group I.

3.      During my employment with VSP, I have conducted and/or participated in numerous investigations involving unlawful activities, including the investigation of gangs/criminal enterprises, narcotics trafficking, firearm offenses, and violent crimes. I am principally involved in narcotics and narcotics-related investigations, including narcotics investigations related to violent offenses, which often involve the criminal use of firearms. From my training and experience, I have become familiar with the methods and techniques utilized by illegal drug traffickers and drug trafficking organizations (DTOs).

4.      From 2008 to 2012 I worked as a uniformed patrol officer for the Hanover County Sheriff's Office where I responded to law enforcement calls for services, investigated crimes,

made arrests, and testified in court. I also received training and experience in this capacity on interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, and narcotics and various other crimes.

5. I am also an infantry officer in the United States Marine Corps and am currently serving as a reservist. I started my employment as a United States Marine Corps officer in May 2004. While serving in this capacity I have been trained and received extensive experience in the functioning, handling, and use of firearms, ammunition, and explosives. During my most recent oversees deployment I was employed as the leader of a security cooperation team in Honduras and greater Central America. There, I was trained and received extensive experience in Counter Transnational Organized Crime operations, thus becoming intimately familiar with large scale criminal, narcotics, firearms, and explosive traffickers and organizations.

6. The facts in this affidavit come from my personal observations, my training and experience, documentations, law enforcement databases, and information obtained from other sworn law enforcement officers and/or witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**PURPOSE OF AFFIDAVIT**

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C §§ 841(a)(1)-possession with intent to distribute controlled substances, distribution of controlled substances, 21 U.S.C. § 846-conspiracy to distribute controlled substances, 18 U.S.C. § 924(c)-possession of a firearm in furtherance of a drug trafficking crime, and/or violations of 18 U.S.C. § 922(g)-felon in possession of a firearm, have been committed by and/or conspired to be committed by Quadir

MCKINNON, Eric VAUGHAN Jr., and Isaiah JOHNSON, and that a search of the Target Devices, as described in Attachment A, may yield evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B. The applied-for warrant requests authorization to conduct forensic examinations on the Target Devices for the purpose of identifying electronically stored data more particularly described in Attachment B.

8.      The Target Devices are currently in the lawful possession of the Virginia State Police (VSP).  The Target Devices came into VSP's possession when they were seized following the execution of a state residential search warrant. Therefore, while the VSP may already have all necessary authority to examine the Target Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Target Devices will comply with the Fourth Amendment and other applicable laws.

9.      The Target Devices are currently in storage at the Virginia State Police High Tech Crimes Division, located at 7700 Midlothian Turnpike, North Chesterfield, Virginia 23225. In my training and experience, I know that the Target Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Devices first came into the possession of the VSP.

## CONFIDENTIAL SOURCE BACKGROUND

10.      During this investigation, law enforcement utilized a Confidential Source of Information (CSI-1) to purchase narcotics at the direction of and under direct supervision of law enforcement. CSI-1 is working for monetary compensation. CSI-1 has multiple felony convictions. These convictions include, but are not limited to, approximately four convictions for crimes related to theft and/or dishonesty, which were adjudicated more than fifteen years ago.

4

11.     CSI-1 was first signed up as a cooperating individual with VSP in 2016.  CSI-1 provided information and then subsequently deactivated due to inactivity. CSI-1 was re-activated in/around October 2021. Following their work in October 2021, CSI-1 was again deactivated for inactivity. CSI-1 has not been deactivated due to any violations. Based on conversations with previous handlers, during periods of activation, CSI-1 has provided information that has led to multiple arrests, successful prosecutions, and the furtherance of criminal investigations. CSI-1's information has been proven to be reliable and accurate based on independent investigation.

12.     In spring of 2022, while deactivated, CSI-1 was arrested out-of-state and charged with felony offenses for possession of narcotics and a firearm. That case is pending adjudication. Following that arrest, CSI-1 notified their previous handler of the incident, who then re-activated CSI-1 in spring of 2022. In December 2022, CSI-1 contacted me regarding the instant investigation. CSI-1 informed me of their arrest in spring of 2022. CSI-1 has been working for monetary compensation and has not yet been promised or offered any judicial consideration in their pending felony case. Information provided by CSI-1 in this investigation has been corroborated by other investigative means and observations.  CSI-1 has been deemed credible and reliable in this case based on corroboration of their information by independent law enforcement investigation and by audio and video recordings of CSI-1's activities conducted under the direction of VSP.

13.     In this case, CSI-1 was utilized to conduct four successful controlled purchases of narcotics from MCKINNON in December 2022.  On each occasion, CSI-1 was searched before and after for contraband and weapons with negative results and their activities were audio/video recorded. Following each controlled purchase, CSI-1 provided a statement to their handler. These statements were consistent with what the handler observed during surveillance and

consistent with what occurred on the audio/video recordings.  The controlled purchases gave law enforcement probable cause to obtain and execute a residential search warrant which led to the successful recovery of significant quantities of suspected dangerous narcotics, marijuana, firearms & ammunition, currency used in controlled purchases of narcotics transactions, and the arrest of one wanted party (VAUGHAN).  Further, CSI-1's information assisted law enforcement in locating and arresting MCKINNON on January 18, 2023 for outstanding warrants related to this case.

## **PROBABLE CAUSE**

### *Background of Investigation*

14.     The United States, including ATF Richmond 1, is conducting a criminal investigation of Quadir MCKINNON, Eric VAUGHAN Jr., and Isaiah JOHNSON regarding possible violations of 21 U.S.C § 841(a)(1)-possession with intent to distribute controlled substances, distribution of controlled substances, 21 U.S.C. § 846-conspiracy to distribute controlled substances, 18 U.S.C. § 924(c)-possession of a firearm in furtherance of a drug trafficking crime, and/or violations of 18 U.S.C. § 922(g)-felon in possession of a firearm.

15.     MCKINNON has numerous felony convictions, including the following:

a.  April 11, 2011: guilty of possession with intent to distribute schedule I or II narcotics (Hopewell)

b.  April 11, 2011: guilty of possession of a firearm while possessing schedule I or II narcotics (Hopewell)

c.  September 4, 2019: guilty of possession of a firearm by a convicted felon (Hopewell)

d.  September 4, 2019: guilty of felony distribution of marijuana (Hopewell)

6

e.  September 4, 2019: guilty of felony possession of schedule I or II narcotics (Hopewell)

f.  March 4, 2020: guilty of felony distribution of marijuana (Hopewell)

g.  March 4, 2020: guilty of felony selling schedule I or II narcotics (Hopewell)

h.  MCKINNON has been found guilty of four additional felony probation violations and currently is on indefinite supervised state probation.

16.  Investigation of MCKINNON identified VAUGHAN as one of MCKINNON's associates. VAUGHAN is also a felon, who recently served a prison sentence for multiple convictions:

a.  January 27, 2014: guilty of burglary: entering a house to murder/rape (Petersburg)

b.  January 27, 2014: guilty of conspiracy to commit burglary: entering a house to murder/rape (Petersburg)

c.  January 27, 2014: guilty of Robbery in a residence (Petersburg)

d.  January 27, 2014: guilty of conspiracy to commit Robbery in a residence (Petersburg)

e.  January 27, 2014: guilty of firearm use in commission of a felony (Petersburg)

f.  January 27, 2014: guilty of Robbery in a residence (Petersburg)

g.  January 27, 2014: guilty of Robbery in a residence (Petersburg)

h.  January 27, 2014: guilty of firearm use in commission of a felony (Petersburg)

i.  January 27, 2014: guilty of firearm use in commission of a felony in Petersburg Circuit Court and imposed a 5 year prison sentence

j.  January 27, 2014: guilty of Abduction by force intimidation or deception (Petersburg)

k.  January 27, 2014: guilty of abduction by force intimidation or deception (Petersburg)

17.     During the second week of December 2022, I was contacted by CSI-1, who reported that during the previous week they observed a large quantity of narcotics—including crystal methamphetamine, fentanyl, cocaine—and multiple firearms in room 158 at the Roadway Inn, located at 4911 Oaklawn Boulevard in Hopewell, Virginia 23860, in the Eastern District of Virginia. CSI-1 reported that a thin, approximately 32-year-old dark-skinned male going by "Quad Black" was selling the narcotics and was also in possession of the firearms. CSI-1 stated that "Quad Black" was typically accompanied by at least two other black males, and that all the males were distributing the narcotics, but "Quad Black" was the ringleader. CSI-1 told me that "Quad Black" instructed CSI-1 to call him if CSI-1 ever wanted to purchase narcotics and gave CSI-1 the phone numbers 804-631-5504 and 804-481-3573.

### The Controlled Buys

18.     To investigate the information provided by CSI-1, I arranged a series of four controlled purchases of narcotics from MCKINNON utilizing CSI-1. On each occasion, CSI-1 met myself and fellow agents at a meeting location close to where MCKINNON was reported to be trafficking narcotics and was provided with audio/video recording devices. CSI-1 was searched for contraband before and after each buy with negative results. CSI-1 was also provided money from the VSP Criminal Fund for each buy and the serial numbers were recorded. During each buy, CSI-1 was only authorized to possess/use the VSP funds provided. Finally, following each buy, CSI-1 provided a statement to the assigned agent. On each occasion, the statement provided was consistent with what the agents observed during surveillance and consistent with what was captured on the audio/video recordings. All of the suspected narcotics purchased by CSI-1 were field-tested using TrueNarc and were all positive for narcotics.

19.    **CONTROLLED BUY 1:**  During the second week of December 2022, at the agents' direction, CSI-1 called 804-481-3573, a phone number associated with MCKINNON, to arrange a controlled purchase of narcotics.  MCKINNON instructed CSI-1 to meet him at the Roadway Inn, 4911 Oaklawn Boulevard in Hopewell, Virginia 23860, in the Eastern District of Virginia, where CSI-1 met MCKINNON in room 154.  MCKINNON sold CSI-1 suspected cocaine in room 154.  As directed, CSI-1 attempted to purchase a quantity of crystal methamphetamine.  MCKINNON informed CSI-1 that he was out of crystal methamphetamine, but he would be getting a large resupply soon and would be able to provide the crystal methamphetamine at a later point.  CSI-1 then immediately returned to the meeting location and turned over the purchased narcotics to the agents.

20.    **CONTROLLED BUY 2:**  Also during the second week of December 2022, at the agents' direction, CSI-1 called 804-481-3573, a phone number associated with MCKINNON, to arrange a controlled purchase of narcotics.  MCKINNON did not answer the phone.  At the agent's direction, CSI-1 went to the Roadway Inn and looked for MCKINNON to attempt another purchase of narcotics. An unknown black male walking on the sidewalk at the hotel directed CSI-1 to find MCKINNON in room 132. CSI-1 knocked on room 132 and was invited in by MCKINNON.  MCKINNON appeared to have just woken up from sleeping in room 132. MCKINNON apologized for sleeping through CSI-1's call.  MCKINNON then sold CSI-1 suspected cocaine, fentanyl, and crystal methamphetamine.  MCKINNON told CSI-1 that he was preparing to get more drugs and could deal a larger quantity of crystal methamphetamine later in the day.  A review of video recording of the controlled purchase shows MCKINNON retrieve the suspected narcotics to sell to CSI-1 from a multicolored backpack.  CSI-1 then promptly departed room 132 and turned over the purchased narcotics at the meeting location. I gave CSI-1

9

instructions to return to the meeting location later the same day to attempt another controlled purchase of narcotics from MCKINNON.

21.    **CONTROLLED BUY 3:** As instructed, later in the day following Controlled Buy 2, CSI-1 returned to the Roadway Inn to attempt another controlled purchase of narcotics. MCKINNON arrived and led CSI-1 into room 132. A review of video recording of the controlled purchase shows MCKINNON retrieve the suspected narcotics to sell to CSI-1 from a multicolored backpack. Once inside, MCKINNON sold CSI-1 a quantity of suspected crystal methamphetamine and cocaine. MCKINNON offered to sell even more narcotics to CSI-1, but CSI-1 declined because they didn't have enough money. CSI-1 then exited room 132 and returned to the meeting location to turn over the purchased narcotics.

22.    **CONTROLLED BUY 4:** During the third week of December 2022, at the agents' direction, CSI-1 contacted MCKINNON at 804-481-3573, a phone number associated with MCKINNON, to arrange the controlled purchase of narcotics. CSI-1 was equipped with an audio/video recording device and went to the Roadway Inn. MCKINNON called CSI-1 from 804-481-3573, a phone number associated with MCKINNON, to inform CSI-1 he was on his way. MCKINNON met CSI-1 inside room 132, where he sold CSI-1 a quantity of suspected crystal methamphetamine and cocaine. MCKINNON was accompanied by two individuals later identified as VAUGHAN and JOHNSON. A review of the video showed at least one firearm present in the room, and also showed JOHNSON assisting MCKINNON with the packaging of narcotics in the room. CSI-1 exited room 132 and went to the meeting location to turn over the purchased narcotics to the agents.

10

### *Search Warrant Execution*

23.     Following the above investigation, on December 19, 2022, I obtained a state arrest warrant for MCKINNON for the distribution of schedule I/II narcotics. I also obtained a state search warrant for room 132 of the Roadway Inn, 4911 Oaklawn Boulevard in Hopewell, Virginia, 23860, and executed it the same night with the assistance of the VSP Tactical Team. The search warrant instructed law enforcement to search room 132, MCKINNON's automobile, and all persons in room 132 for "[I]tems related to the distribution of illegal narcotics. To include documents, scales, monies, cellular phones, and phone/ address books, banking ledgers and documents. photographs, electronic storage devices, personal computers, packaging materials, safes, audio and video recording, and all data contained within those devices. Items related to and or derived from the sale of illegal narcotics to include firearms and firearm accessories."

24.     During surveillance prior to the execution of the search warrant, MCKINNON, JOHNSON, and VAUGHAN were observed entering and exiting room 132 multiple times. Law enforcement saw VAUGHAN enter room 132 carrying a black backpack with a "Jason" mask design.

25.     JOHNSON and VAUGHAN were present in room 132 at the time of the execution of the search warrant. JOHNSON was hiding inside of room 132's closet. Also in the closet was an AK-47-style firearm and baggies of suspected schedule I/II narcotics. VAUGHAN was laying on the floor between the two beds.  MCKINNON was not present for the execution of the search warrant. Law enforcement later learned that MCKINNON went to a nearby residence prior to the execution of the search warrant.

11

26.     Recovered from inside room 132 were quantities of packaged (suspected) powdered cocaine, crack cocaine, fentanyl, marijuana, digital scales, U.S. currency, multiple cell phones, packaging supplies, cutting agents, an AK-47 style NAK9 9mm assault pistol, a .38 caliber Rossi revolver pistol, a Glock model 43X 9mm semi-automatic pistol, a Smith & Wesson SW 40V .40 caliber semi-automatic pistol, and multiple calibers of ammunition. Quantities of suspected cocaine, fentanyl, and marijuana were found in the multicolored backpack and the "Jason" mask backpack that investigation associated with MCKINNON and VAUGHAN, respectively. The multicolored backpack found during the search warrant matched the multicolored backpack that I observed MCKINNON retrieve narcotics from during more than one controlled purchase. It is also the same backpack that I observed in MCKINNON's possession on hotel surveillance video on the day of the search warrant execution. Law enforcement also recovered work documents addressed to MCKINNON in a shoe box underneath the nightstand.

27.     Also recovered from room 132, and subject to the search warrant, were the four Target Devices:

a.  ONE BLACK LG CELL PHONE (found on the right-side bed next to the "Jason" mask backpack associated with VAUGHAN);

b.  ONE RED APPLE IPHONE (on the lamp table between the beds and claimed by JOHNSON);

c.  ONE BLACK FLIP PHONE (on the left-side bed next to the multicolored backpack, containing suspected cocaine, associated with MCKINNON); and

d.  ONE BLACK APPLE I-PHONE (found in VAUGHAN's pants pocket).

28.     Both JOHNSON and VAUGHAN provided post-Miranda statements to law enforcement. JOHNSON denied knowledge of the narcotics and firearms in the room and claimed ownership of the RED APPLE IPHONE (Target Device). VAUGHAN admitted that he is a felon but denied knowledge of the narcotics and firearms in the room and stated he was "just there to smoke marijuana."

29.     JOHNSON was released following the search warrant pending further investigation and charges.  VAUGHAN was arrested due to outstanding warrants for multiple felony probation violations.  MCKINNON remained at large for the outstanding narcotics distribution warrant until his arrest on January 18, 2023.

30.     Hours after the search warrant execution, at approximately 12:28 AM, MCKINNON called VSP dispatch on a recorded line and inquired about what occurred in room 132, which he stated was in his name. MCKINNON provided his first and last name and phone number 804-481-3573 to dispatch.  This is the same phone number CSI-1 contacted to purchase narcotics from MCKINNON during the controlled buys. MCKINNON also stated that he was not present at the time of the search warrant because he was at his grandmother's.

**USE OF CELLULAR PHONES FOR CRIMINAL ACTIVITY**

31.     Based on my training and experience, I know that cellular telephones like the Target Devices are important to a criminal investigation of the distribution of illegal narcotics. In particular, I know:

  a.  that narcotic traffickers often use cellular telephones to communicate with sources of supply, drug transporters, facilitators, and customers in connection with their ongoing drug activities, including communication by live conversations, voice messages, text

messages, emails, and similar communication methods all conducted via the cellular telephones that often have internet capabilities;

b.  that narcotic traffickers often use cellular telephones to maintain records, contact information, notes, ledgers, and other records relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code. That the aforementioned books, records, notes, ledgers, etc., are commonly maintained where narcotic traffickers have ready access to them, including but not limited to their cellular telephones;

c.  that narcotic traffickers use communication applications ("apps") to contact associates and customers,

d.  that narcotic traffickers commonly maintain names, addresses and telephone numbers in their cellular telephones for their associates in the narcotic trafficking organization, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devices; and

e.  that many cellular telephones have extensive photography and video capabilities. That many narcotic traffickers frequently use their cellular telephones to take, cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos, on their cellular telephone.

32.  I am aware, through training and experience, that individuals involved in drug trafficking will frequently take photographs of themselves with cellular telephones holding firearms, money, and other indicia of illegal activities in order to give themselves greater credibility as an established, armed narcotics or firearms trafficker and to convey that they will

14

resist any attempts by customers or suppliers to rob them of their drugs and their drug trafficking proceeds.  Also, given that devices like the Target Devices are so frequently utilized in day-to-day life, I know that queries or searches for particular make and models of firearms may also be undertaken.

33.     I am familiar with methods employed by drug traffickers to attempt to thwart any investigation of their criminal activity. These tactics, employed in part to evade law enforcement, include their criminal use of and association with: multiple residences, multiple cellular phones, counter surveillance, smuggling schemes, false or fictitious identities, coded communications and conversations and the use of firearms to ensure facilitation of the illegal activity. I know it is common for drug traffickers to keep multiple phones or to change phones in order to evade detection by law enforcement.

## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. **Wireless telephone**:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic

"address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless phones also download applications ("Apps") that are used for a variety of purposes including, but not limited to social media Apps, communication Apps, payment and banking Apps, map Apps and digital storage Apps. Most wireless telephones today also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage

16

media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connected to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e.  **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.    Based on my training, experience, and research, I know the Target Devices to have capabilities that allow them to serve as a wireless telephone, digital camera, portable music/media player, connect to the internet, send and receive emails, and/or send and receive

text messages.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.    Based on my knowledge, training, and experience, I know that electronic devices, like the Target Devices, can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices.  This information can sometimes be recovered with forensics tools.

37.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of drug trafficking crimes as described herein, but also may provide forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be found on the Target Devices because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

18

d.      The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38.      *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

39.      *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

40.     Based on the foregoing, there is probable cause to believe that MCKINNON, VAUGHAN, and JOHNSON committed and/or conspired to commit violations of 21 U.S.C §§ 841(a)(1)-possession with intent to distribute controlled substances, distribution of controlled substances, 21 U.S.C. § 846-conspiracy to distribute controlled substances, 18 U.S.C. § 924(c)-possession of a firearm in furtherance of a drug trafficking crime, and/or violations of 18 U.S.C. § 922(g)-felon in possession of a firearm.

41.     For the reasons described above, I know that individuals who commit, conspire, or attempt to commit these kinds of crimes are likely to have evidence of these crimes stored in their cell phones. Therefore, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Davis Gooding*

Davis B. Gooding
Task Force Officer
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn and attested to me by the Affiant on February 3, 2023 in accordance  with the requirements of Fed. R. Crim. P. 4.1 by telephone.

/s/    MRC

HON. MARK R. COLOMBELL
United States Magistrate Judge
Eastern District of Virginia

Date:  February 3, 2023

20

## ATTACHMENT A

The property to be searched is:

ONE BLACK LG CELL PHONE, ONE RED APPLE IPHONE, ONE BLACK FLIP PHONE,
AND ONE BLACK APPLE I-PHONE SEIZED BY VIRGINIA STATE POLICE
SUBSEQUENT TO STATE SEARCH WARRANT ON DECEMBER 19, 2022 CURRENTLY
LOCATED AT VIRGINIA STATE POLICE HIGH TECH CRIMES DIVISION 7700
MIDLOTHIAN TURNPIKE NORTH CHESTERFIELD, VIRGINIA 23225, IN THE
EASTERN DISTRICT OF VIRGINIA.

      1.    This warrant authorizes the forensic examination of the devices for the purpose of

identifying the electronically stored information described in Attachment B, which is

incorporated by reference.

## ATTACHMENT B

1.      All records in the Target Devices, described in Attachment A, which is

incorporated by reference herein, that relate to violations 21 U.S.C §§ 841(a)(1) – Possession

with Intent to Distribute/Distribution of Controlled Substances, 21 U.S.C. §  846 – Conspiracy to

Possess with Intent to Distribute Controlled Substances/Distribute Controlled Substances, 18

U.S.C. § 924(c) – Possession of a Firearm in Furtherance of a Drug Trafficking Crime, and/or 18

U.S.C. § 922(g) – Possession of a Firearm by a Convicted Felon, including:

     a.  Notes, ledgers, messages, and similar records relating to the transportation, ordering, purchasing, and distribution of illegal controlled substances;

     b.  Notes, ledgers, messages, and similar records relating to the ordering , purchasing, and distribution of firearms;

     c.  Address books, phone books, applications ("Apps"), and similar records reflecting names, addresses, telephone numbers and other contact or identification data of customers and suppliers of illegal narcotics and/or firearms;

     d.  Applications and records relating to drug trafficking proceeds and expenditures of money and wealth, including bank records, deposit receipts, investments and cryptocurrency;

     e.  Calendars, applications, and other records of meetings, locations, schedules, and interstate and foreign travel;

     f.  Digital photographs, videos, or audio recordings of MCKINNON, VAUGHAN, JOHNSON and/or their confederates, assets, controlled substances, expenditure of drug proceeds, and specific locations documented by the cellular device;

     g.  Digital photographs, videos, or audio recordings of MCKINNON, VAUGHAN, JOHNSON and/or their confederates and firearms;

     h.  Stored communications, including text messages, MMS messages, voicemails, application communications, social media communications;

     i.  Any subscriber or owner information for the cellular telephones; and

     j.  Any cellular telephone records, and telephone books or lists, or receipts relating to the acquisition and purchase of cellular telephones, or minutes purchased or applied to cellular telephones.

2.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of devices or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.      Evidence of user attribution showing who used or owned the Target Devices at the time the things described in this warrant occurred, such as logs, phonebooks, saved usernames and passwords, documents, browsing history and location history.